UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE SLOWINSKI and | ) | |
| DAVID HAYES, individually and | ) | |
| on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 24-cv-513 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BLUETRITON BRANDS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Christine Slowinski and David Hayes walked into the grocery store one day and purchased packages of Ice Mountain bottled water, produced by BlueTriton Brands, Inc. The packaging for the water bottles shows a snow-capped mountain towering over an idyllic landscape, surrounded by blue skies and evergreen trees. Down below, the reflection of the mountain appears on a body of cool, refreshing, thirst-quenching water. If the ice-covered mountain doesn't make you thirsty, then the serene glacial lake probably will.

The packaging also includes four words: "100% Natural Spring Water." Those words might prompt thirst, but they also prompted a lawsuit. Slowinski and Hayes think that Ice Mountain isn't *really* "100% Natural." They believe that their $H_2O$ is contaminated with chemical compounds, which come from microplastics.

Slowinski and Hayes allege that plastic migrated from their water bottles into the water itself. And Slowinski and Hayes claim that the "100% Natural" label hoodwinked them into purchasing Ice Mountain's contaminated water.

Congress vested the Food and Drug Administration with the exclusive power to define the meaning of terms about food. Congress also made clear that the definitions would preempt any state requirements. The FDA exercised that authority and adopted a detailed definition of "spring water."

In essence, Plaintiffs allege that the Ice Mountain water isn't 100% natural spring water because it includes microplastics. But the FDA's definition says nothing about microplastics. The existence of microplastics doesn't mean that the spring water isn't spring water. And it doesn't mean that the spring water isn't natural.

Maybe Plaintiffs believe that water bottles don't contain 100% natural spring water because they also contain itsy-bitsy, teeny-tiny pieces of microplastics. That is, the bottles contained spring water, and something else (*i.e.*, microplastics), so it didn't contain 100% spring water.

It is true that plastic isn't water. But the microplastics are microscopic. By comparison, they make a human hair look like a giant.

No reasonable consumer would think that a bottle of water wasn't a bottle of water because it contained infinitesimally small amounts of microplastics. No reasonable consumer would think that "100% Natural Spring Water" is a guarantee at the molecular level, except that it contains hydrogen and oxygen playing together nicely. No reasonable consumer would feel duped because the label didn't say 99.9999999999% spring water (or whatever the number would be).

The complaint doesn't hold water. For the following reasons, BlueTriton's motion to dismiss is granted.

**Background**

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations.  *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020).  The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint."  *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

*The Parties*

Defendant BlueTriton Brands, Inc. is a Connecticut-based beverage company.  *See* Cplt., at ¶ 4 (Dckt. No. 1-1).  The name "BlueTriton" might not ring a bell to the average American.  But most people are probably familiar with at least one of the company's regional bottled water brands – such as Deer Park, Arrowhead, Ice Mountain, Poland Spring, Saratoga, and Pure Life.  *See* BlueTriton, https://www.bluetriton.com/ (last visited August 6, 2024).

Here in the mountainless Midwest, consumers likely know Ice Mountain best.  Ice Mountain bottled water is a familiar sight on grocery store shelves in the Chicagoland area.

As fate would have it, Ice Mountain is also the brand of water offered as a courtesy by Uncle Sam down the hall here on the 23rd floor of the Dirksen Federal Building.  Five-gallon jugs of Ice Mountain water are a fixture of the 23rd floor, and throughout the federal courthouse.  Jurors drink it.  So do jurists.  Full disclosure:  this Court does not know if any microplastics went down the judicial hatch.

The Ice Mountain label prominently features a snow-capped peak, with lush pine trees soaking up sunshine on the shores of a crystal-blue glacial lake.  *See* Cplt., at ¶ 25 (Dckt. No. 1-1).  Below the words "Ice Mountain," the label reads:  "100% NATURAL SPRING WATER."  *Id.*

3

Plaintiffs Christine Slowinski and David Hayes are consumers who purchased Ice Mountain bottled water at grocery stores in Illinois. *Id.* at ¶¶ 27–28. They believe that the label on Ice Mountain water is a misnomer. According to them, Ice Mountain water isn't "100% Natural Spring Water" because it contains microplastics. *Id.* at ¶ 7.

***Microplastics***

Microplastics are small plastic particles that originate from the manufacturing and degradation of plastics. *Id.* at ¶ 8.

The word "microplastics" encompasses a variety of "molecules" with different structures, shapes, sizes, and polymers. *Id.* According to the Environmental Protection Agency, the largest microplastics are 5 millimeters (about the size of a pencil eraser). *See Microplastics Research*, EPA (May 1, 2024), https://www.epa.gov/water-research/microplastics-research.[1] The smallest microplastics, known as "nanoplastics," are too small to be seen by the human eye. *Id.* Some microplastics are just 1 nanometer. *Id.* By point of comparison, a strand of human hair is about 80,000 nanometers wide. *Id.*

Microplastics are everywhere. "Microplastics have been found in every ecosystem on the planet, from the Antarctic tundra to tropical coral reefs, and have been found in food, beverages, and human and animal tissue." *Id.*

Microplastics are probably in your mouth, and nose, and lungs, and everywhere else. There might be microplastics on the piece of paper that you're holding right now. There might be microplastics in the food you ate for dinner last night. Or there might be microplastics in the air that you're breathing. They're inescapable.

---

[1] The Court can take judicial notice of documents on government websites. *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *7 (N.D. Ill. 2022); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

For now, the effect of microplastics on humans is not fully understood. *See* Cplt., at ¶ 12 (Dckt. No. 1-1). But some research suggests that microplastics have negative health effects. *Id.*

Relevant here, microplastics can "leach out" from plastic water bottles into the water. *Id.* at ¶ 10. According to a 2019 study, water bottles can "leach out" microplastics when their caps are twisted on and off. *Id.* at ¶ 11. In essence, microplastics can release from the bottleneck and cap when a bottle is opened and closed. *Id.*

Water bottle contamination appears to be a common phenomenon. In a 2018 study, Orb Media tested water bottles from 11 brands (not including Ice Mountain). *Id.* at ¶ 15. The study found signs of microplastic contamination in 93% of tested water bottles. *Id.*

Of course, plastic bottles aren't the only water contamination culprit. Microplastics are inescapable. They can leach into tap water, too. *See Impacts of Plastic Pollution*, EPA (Apr. 23, 2024), https://www.epa.gov/plastics/impacts-plastic-pollution.

### *The Ice Mountain Packaging*

Recall that Ice Mountain labels its water "100% Natural Spring Water." *See* Cplt., at ¶ 25 (Dckt. No. 1-1). In Plaintiffs' view, the "100% Natural" label leads a reasonable consumer to believe that Ice Mountain water won't contain any synthetic contaminants. *Id.* at ¶¶ 23–24.

Yet, according to Plaintiffs, customers who drink Ice Mountain water are consuming synthetic plastic particles – *i.e.*, microplastics. *Id.* at ¶¶ 26, 29. Plaintiffs allege that the Ice Mountain water that they purchased contained microplastics. *Id.* at ¶ 29. But the complaint does not shed light on how they reached that conclusion. That is, the complaint does not allege that Plaintiffs tested the products that they bought for microplastics (or that they tested any Ice Mountain water for microplastics, at all).

According to Plaintiffs, Ice Mountain's labeling induced them to choose its product over other options on the market. Plaintiffs allege that BlueTriton knew that its water contained microplastics, but "chose to label the Products with 100% Natural Spring Water labeling anyway to induce consumers to purchase the products." *Id.* at ¶ 40.

Plaintiffs claim that they bought Ice Mountain because its "advertising claimed that the Products were 100% Natural Spring Water." *Id.* at ¶ 35. Plaintiffs assert that BlueTriton "impaired Plaintiffs' ability to choose the type and quality of products they chose to buy." *Id.* at ¶ 31. Because of the labeling, Plaintiffs "could not have known that the Products contained microplastics" at the time of purchase. *Id.* at ¶ 36. They allege that they paid a premium for the water because of the "fraudulent labeling." *Id.* at ¶ 34.

***The Litigation***

Plaintiffs filed a putative class action lawsuit against BlueTriton in state court. *See* Cplt. (Dckt. No. 1-1). The proposed class consists of "[a]ll persons within the United States who purchased the Products within five years prior to the filing of the Complaint through the date of class certification." *Id.* at ¶ 42. In addition, Plaintiffs propose a subclass: "All persons within the State of Illinois who purchased the Products within five years prior to the filing of the Complaint through the date of class certification." *Id.* at ¶ 43.

The complaint contains three counts under Illinois law. Count I alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq. Id.* at ¶¶ 47–55. Count II is a claim for common-law fraud. *Id.* at ¶¶ 56–61. Finally, Count III is an unjust enrichment claim. *Id.* at ¶¶ 62–66. Plaintiffs seek damages, injunctive relief, and attorneys' fees and costs. *Id.* at 12–15.

BlueTriton removed the case to federal court, invoking jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453. *See* Notice of Removal (Dckt. No. 1).

Then, BlueTriton moved to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). *See* Def.'s Mtn. to Dismiss (Dckt. No. 14).

BlueTriton believes that Plaintiffs lack standing to seek injunctive relief and to proceed on behalf of a nationwide class.

On the merits, BlueTriton contends that Plaintiffs' claims are expressly preempted by the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 343–1(a)(5), 337(a). BlueTriton also argues that Plaintiffs fail to meet Rule 9(b)'s heightened pleading standard for fraud. Next, BlueTriton contends that the complaint fails to allege a material misrepresentation.

## Legal Standard

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A party can bring either a facial challenge or a factual challenge to a plaintiff's standing. *See Apex Dig.*, 572 F.3d at 443. A facial challenge means that the complaint does not sufficiently allege that the plaintiff has standing. *Id.* A facial challenge operates like an ordinary motion to dismiss. A court must "accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor," and cannot rely on evidence

outside the pleadings. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (citation omitted).

In contrast, a factual challenge involves an argument about real-world facts, not the allegations of the complaint. The complaint may be "formally sufficient," but "there is *in fact* no subject matter jurisdiction." *See Apex Dig.*, 572 F.3d at 444 (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)) (emphasis in original). In a factual challenge, a court may consider "whatever evidence has been submitted" on the issue of standing. *Id.*

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Claims about fraud – including allegations of deceptive acts or practices under the ICFA – require the plaintiff to meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances

constituting fraud." *See* Fed. R. Civ. P. 9(b). The plaintiff must allege the "who, what, when, where, and how" of the alleged fraud. *See Vanzant*, 934 F.3d at 738.

## Analysis

The complaint includes two claims that sound in fraud. Count I is a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and Count II is a common-law fraud claim. *See* Cplt., at ¶¶ 47–61 (Dckt. No. 1-1).

The ICFA prohibits "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce." *See* 815 ILCS 505/2. An ICFA claim has five elements: (1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception. *See Newman v. Met. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018); *Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014); *De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009).

A common-law fraud claim is similar. *See Newman*, 885 F.3d at 1003. "The claim requires a plaintiff to plead and prove that: (1) the defendant made a false statement of material fact, (2) the defendant knew that the statement was false, (3) the defendant intended that the statement induce the plaintiff to act, (4) the plaintiff did act in reliance on the statement, and (5) the plaintiff was damaged from her reliance on the statement." *Matthews v. Polar Corp.*, 2023 WL 4534543, at *10 (N.D. Ill. 2023) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)); *see also Doe v. Dilling*, 888 N.E.2d 24, 35 (Ill. 2008).

BlueTriton challenges Plaintiffs' Article III standing, so the Court starts there. Next, the Court addresses preemption under the FDCA. Then, the Court turns to BlueTriton's arguments

on the merits about whether Plaintiffs plausibly pleaded their claims under Rule 9(b). Finally, the Court discusses Plaintiffs' request for leave to file an amended complaint.

## I.    Standing

Article III vests federal courts with the power to decide "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. The doctrine of standing flows from this bedrock requirement. Standing is a "short-hand term for the right to seek judicial relief for an alleged injury." *Simic v. City of Chicago,* 851 F.3d 734, 738 (7th Cir. 2017).

Courts use a three-prong test to determine whether a plaintiff has standing to bring a claim. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The party invoking federal jurisdiction must show that "(1) the plaintiff has suffered an injury-in-fact, (2) the injury was caused by the defendant, and (3) the injury is redressable by judicial relief." *Ewing v. MED-1 Sols., LLC,* 24 F.4th 1146, 1151 (7th Cir. 2022) (citing *Lujan*, 504 U.S. at 560–61); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Standing is remedy-specific. It "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *see also Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 813 (7th Cir. 2018) ("[A] plaintiff must have standing for each form of relief sought.").

BlueTriton makes two arguments about standing. First, it contends that Plaintiffs lack standing to pursue injunctive relief. *See* Def.'s Mem., at 15 (Dckt. No. 15). Second, it asserts that Plaintiffs lack standing to represent a nationwide class of purchasers because "they fail to allege they resided or bought Ice Mountain spring water anywhere else." *Id.* The Court will address each argument in turn.

A.        **Injunctive Relief**

BlueTriton contends that Plaintiffs lack standing to seek injunctive relief because they do not plausibly allege a risk of future harm.  *See* Def.'s Mem., at 15 (Dckt. No. 15).

"Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564.  A plaintiff must allege "a real and immediate threat" of a future injury. *See Access Living of Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 613 (7th Cir. 2020). Simply alleging a possible future injury is insufficient because it is too conjectural.  *Id.*

Courts have applied this principle to the consumer-fraud context.  "Once a plaintiff knows that a product is deficient, he or she is unlikely to purchase it again, and therefore unlikely to sustain future harm.  A 'fool me once' plaintiff does not need an injunction if he or she is not going to buy the product again anyway.  There is no risk of 'fool me twice,' so there is no basis for an injunction."  *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702 (N.D. Ill. 2020).

That principle applies in full force here.  There is no need for an injunction because there is no reason to think that Plaintiffs will ever suffer the same harm again.  Plaintiffs do not allege that they plan to buy Ice Mountain water again.  Plaintiffs allege that they would not have purchased the water at all, had they known that it contained microplastics.  They will drink something else.

And even if Plaintiffs did intend to buy Ice Mountain in the future, they now know about the microplastics.  BlueTriton's labeling can't trick Plaintiffs anymore.  They're not likely to be fooled a second time.

For this reason, "[c]ourts in this district consistently hold that plaintiffs bringing deceptive trade practice claims based on past illegal conduct do not have standing to seek

11

injunctive relief because the plaintiff is aware of the allegedly deceptive practices and any potential for future harm is speculative." *Bruno v. Am. Textile Co., Inc.*, 2023 WL 6976826, at *6 (N.D. Ill. 2023); *see also Fleming v. Dr. Squatch, LLC*, 2024 WL 1676943, at *6 (N.D. Ill. 2024) (holding that plaintiff lacked standing to seek an injunction "because she is aware of the alleged deception, so any future harm is speculative"); *Rice v. Dreyer's Grand Ice Cream, Inc.*, 2022 WL 3908665, at *2 (N.D. Ill. 2022) ("Because Rice is aware of the presence of vegetable oil in the product, he faces no risk of future harm from being deceived by the failure of the product's front label to mention vegetable oil, and he therefore lacks standing to seek prospective injunctive relief."); *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *10 (N.D. Ill. 2022) ("The complaint does not allege that Curtis plans to purchase the products again, and even if she did, she wouldn't be fooled. Without a risk of future injury, there is no basis for an injunction protecting her from injury.").

Plaintiffs do not have standing to pursue injunctive relief because they have not alleged a likelihood of future deception. A "fool me once" plaintiff is not at risk of suffering a future "fool me twice" injury.

Plaintiffs' demand for injunctive relief is dismissed.

### B. Standing as Class Representatives

Next, BlueTriton challenges Plaintiffs' standing to represent a nationwide class of Ice Mountain spring water purchasers "because they have not alleged an injury in those jurisdictions." *See* Def.'s Mem., at 15 (Dckt. No. 15). Plaintiffs do not respond to this argument. *Cf.* Pls.' Resp. (Dckt No. 16) (not addressing Plaintiffs' standing to represent a nationwide class).

12

Courts typically start with Article III standing – because without standing, a plaintiff cannot stay in federal court. *See Access Living*, 958 F.3d at 608. However, the use of the class-action device creates a narrow lane for deferring a ruling on standing.

The Supreme Court has indicated that class-certification issues under Rule 23 of the Federal Rules of Civil Procedure should, in some instances, be addressed before standing. In *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court agreed with the Third Circuit's decision to address class certification before Article III standing because resolution of the class-certification issues was dispositive and "logically antecedent to the existence of any Article III issues." *Id.* at 613.

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Supreme Court again concluded that class-certification issues were "logically antecedent" to standing questions. *Id.* at 831. Thus, the Court determined that "the issue about Rule 23 certification should be treated" before Article III standing. *Id.* (quoting *Amchem*, 521 U.S. at 612–613).

Following the precedents of *Amchem* and *Ortiz*, the Seventh Circuit in *Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002), addressed class certification before standing. *Id.* at 680. The Seventh Circuit explained that "certification of a class changes the standing aspects of a suit," because a certified class "has a legal status separate from and independent of the interest asserted by the named plaintiff." *Id.* (citations omitted).

*Payton* is not exactly like this case. In *Payton*, the named plaintiffs sought to represent a class who had all suffered injuries from action taken under the same statute. *Id.* at 682. Here, Plaintiffs are seeking to represent a nationwide class – presumably, with cases arising under the laws of other states – while Plaintiffs allege only that they lived and suffered injury in Illinois.

In this district, courts are split on whether they can wait to rule on standing until after class certification. Some courts have concluded that *Amchem* and *Ortiz* allow them to delay ruling on standing in cases like this one. *See, e.g.*, *Havrilla v. Centene Corp.*, 2024 WL 1932916, at *12 (N.D. Ill. 2024) (Maldonado, J.) (delaying consideration of the standing question because "the class certification issues are 'logically antecedent' to the standing concerns"); *Bietsch v. Sergeant's Pet Care Prod., Inc.*, 2016 WL 1011512, at *9 (N.D. Ill. 2016) (Ellis, J.) (deferring the question whether plaintiffs can represent a multistate class for consumer-fraud claims until the class-certification stage); *Halperin v. Int'l Web Servs., LLC,* 123 F. Supp. 3d 999, 1009 (N.D. Ill. 2015) (Feinerman, J.) (same); *Cohan v. Medline Indus., Inc.*, 2014 WL 4244314, at *2 (N.D. Ill. 2014) (Shah, J.) ("Standing in the class action context can and should be evaluated with respect to the individual named-plaintiff and later – in the event a class is certified – with respect to the class as a whole.") (citing *Payton*, 308 F.3d at 680).

Other courts in this district have interpreted *Amchem* and *Ortiz* more narrowly. These courts view *Amchem* and *Ortiz* as allowing courts to defer a ruling on standing only when a class-certification issue is case-dispositive. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *6 (N.D. Ill. 2013) (Dow, J.) (interpreting "*Ortiz* as requiring a court simultaneously facing both class certification and Article III standing to deal with Rule 23 issues first when they are dispositive, but not directing district courts to postpone an inquiry into the threshold issue of justiciability outside of that context"); *Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 735 (N.D. Ill. 2015) (Pallmeyer, J.) (same). *But see Muir v. Nature's Bounty (DE), Inc.*, 2018 WL 3647115, at *8 (N.D. Ill. 2018) (Pallmeyer, J.) ("In light of the growing weight of authority that treats 'disjunctures' between a class representatives' claims and

14

those of absent class members as a problem to be analyzed under the rubric of Rule 23, rather than the doctrine of statutory standing . . . the court will do the same here.").

A third group of courts view whether a plaintiff can represent a multi-state class as a substantive issue, not a standing issue. *See, e.g.*, *Clark v. Blue Diamond Growers*, 2023 WL 4351464, at *6 (N.D. Ill. 2023) (Alonso, J.) ("[W]hether a plaintiff must have a valid claim under every legal theory he seeks to assert on behalf of a class goes to the propriety of class certification."); *Wyant v. Dude Prod., Inc.*, 2022 WL 621815, at *3 (N.D. Ill. 2022) (Coleman, J.); *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 859 (N.D. Ill. 2021) (Chang, J.); *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 408 (N.D. Ill. 2021) (Gottschall, J.); *Benson v. Newell Brands, Inc.*, 2020 WL 1863296, at *4 (N.D. Ill. Apr. 2020) (Guzman, J.); *Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1082 (N.D. Ill. 2018) (Wood, J.); *In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, 2017 WL 2215025, at *7 (N.D. Ill. 2017) (St. Eve, J.); *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) (Leinenweber, J.).

This approach stems from the idea that standing requires nothing beyond an injury in fact that is caused by the defendant and redressable in court. *See Lujan*, 504 U.S. at 560–61. Put differently, "the question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing or jurisdiction." *Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016). Once a plaintiff satisfies the three-part standing inquiry, nothing else is required.

Most courts in this district have adopted this approach. "The prevailing view, particularly recently, is that the issue is best framed through the class-certification lens, not standing." *Clark*, 2023 WL 4351464, at *6 (collecting cases). This Court agrees. Whether

Plaintiffs can represent a nationwide class is a class-certification question, not an Article III question.

Plaintiffs allege that they personally bought the water bottles, and suffered an injury from the labeling. So they have standing (for their own alleged injuries, anyway).

At bottom, BlueTriton's argument does not have the look and feel of an Article III standing issue. BlueTriton does not argue that Slowinski and Hayes fail to satisfy the three-prong standing test to seek damages for their ICFA and common-law fraud claims.

Instead, BlueTriton expresses doubt about Plaintiffs' ability to represent a nationwide class under Rule 23. "What [BlueTriton] really contests is [Plaintiffs'] ability to represent the class, and that issue is best addressed at the class certification stage." *Terrazzino*, 335 F. Supp. 3d at 1082.

Plaintiffs can stand on their own two feet. Whether they can represent anyone else is a class-certification question.

In sum, the Court agrees with the prevailing view in this district. A plaintiff who personally suffered an injury in fact has standing. Whether that person can represent a nationwide class is a class-certification problem, not a standing problem. Class certification is tomorrow's problem, not today's problem.

## II.     Parsing "100% Natural Spring Water"

Before diving into the arguments, the Court takes a quick dip into the language of the label that Plaintiffs found so confounding. The complaint takes issue with Ice Mountain's use of the phrase "100% Natural Spring Water."

Strictly speaking, that phrase could mean a few different things, especially in the hands of someone with creative energy and too much free time on their hands. It depends on what

16

"100%" modifies. *See Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 475 (7th Cir. 2020) (discussing the meaning of "100% Grated Parmesan Cheese").

Maybe 100% modifies "water." That is, maybe it means that everything in the bottle is water. So, if the consumer buys the bottle and takes a big swig, that consumer can rest assured that it doesn't contain anything that *isn't* water. There is no Coca-Cola in the bottle. No toxic sludge. No sugar. No artificial flavoring. Just water.

Or maybe 100% modifies "spring water." Maybe the point is that all of the water came from a spring. None of the water came from reverse osmosis. None of the water is tap water or groundwater, either. None of the water came from the tap in Chernobyl.

Another possibility is that 100% modifies "natural." The water is "100% natural." It was made by nature, not by a mad scientist somewhere. A similar possibility is that everything in the bottle is natural, and nothing is unnatural. There is nothing fake or manmade.

Or maybe 100% modifies "natural spring." Maybe the point is that the water came from a natural spring, and not an unnatural spring. It's hard to know what an unnatural spring could be. One would think that only Mother Nature could create a spring. Maybe fracking affects water flow somehow – who knows – but the scenarios for an unnatural spring seem like quite a stretch.

All of this discussion seems like an exercise that only a lawyer or a linguist could enjoy. Most consumers aren't going to be stumped by the phrase "100% Natural Spring Water."

The likelihood of a reasonable consumer getting stumped is smaller than the size of a piece of microplastic. "100% Natural Spring Water" means that it is a bottle of water, and the water came from a natural spring. A consumer who is confused by that label probably has bigger problems on their hands than the need for a cool, refreshing drink.

17

Even so, there is some question about what, exactly, Plaintiffs are alleging. Are Plaintiffs alleging that the spring water isn't 100% natural? Or, are Plaintiffs alleging that less than 100% of the contents of each bottle is natural spring water, because the bottle also contains microplastics?

Inserting some quotation marks might help illustrate the point.

Plaintiffs appear to be arguing that the water bottle does not contain "100% natural" spring water. That is, Plaintiffs seem to claim that the spring water isn't *natural* spring water, because it also contains microplastics. The theory of the case seems to be that the water isn't 100% natural because each bottle has itsy-bitsy plastic contaminants.

Another possibility (which seems less likely) is that Plaintiffs are claiming that less than 100% of the contents of each water bottle is "natural spring water." That is, maybe Plaintiffs are alleging that the water bottle does not contain *only* spring water. The water bottle contains spring water, *plus* something else (microplastics), so it contains more than just spring water.

Whatever the claim, it has no staying power. The claim is preempted if Plaintiffs are challenging what it means to be natural spring water. And the claim fails if Plaintiffs believe that the presence of microscopic particles means that the water bottle contains more than simply water. No reasonable consumer would get duped by a failure to make a disclosure on the molecular level.

With that windup, the Court turns to the arguments at hand.

## III. Preemption Under the FDCA

The starting point is federal preemption. In BlueTriton's view, the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 343–1(a)(5), 337(a), preempts all of Plaintiffs' claims. *See* Def.'s Mem., at 5 (Dckt. No. 15).

18

"Preemption doctrine stems from the Supremacy Clause[.]"  *McHenry Cnty. v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022) (citing U.S. Const. art. VI).  Federal law is top dog under the Supremacy Clause.  "[W]hen federal and state law conflict, federal law prevails and state law is preempted."  *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 471 (2018).

Federal preemption of state law comes in three flavors:  "express preemption, field preemption, and conflict preemption."  *See Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453, 457 (7th Cir. 2023).  This case involves express preemption, which comes into play when a statute says "explicitly what states may and may not do."  *Nationwide Freight Sys., Inc. v. Illinois Com. Comm'n*, 784 F.3d 367, 373 (7th Cir. 2015).

Preemption is an affirmative defense, so the defendant bears the burden of proof.  *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019).  A plaintiff only loses on preemption grounds if she "has pleaded herself out of court."  *Id.*

Pleading oneself out of court is a rare feat.  "Rarely will the face of the complaint so clearly prove the opponent's affirmative defense that immediate dismissal, prior to the filing of an answer, will be proper."  *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022).  But sometimes rare feats happen.

"The FDCA statutory regime is designed primarily to protect the health and safety of the public at large."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014).  To achieve that end, the Act gives the Food and Drug Administration the power to "promulgate regulations fixing and establishing for any food . . . a reasonable definition and standard of identity."  *See* 21 U.S.C. § 341.

The FDCA contains an express preemption provision.  *See Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 483 (7th Cir. 2020).  That provision forbids states from imposing "any

requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g)." *See* 21 U.S.C. § 343–1(a)(1).

"Identical" is the key word. A state can't impose additional obligations even if a plaintiff could comply with both the federal and state laws. "Even if the disclaimers that the plaintiff wants added would be consistent with the requirements imposed by the Food, Drug, and Cosmetic Act, consistency is not the test; identity is." *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011).

"[W]hen a standard of identity lists labeling disclosures that are affirmatively required, state law may not tack on further required disclosures that the federal standard does not mention." *Bell*, 982 F.3d at 484. This preemption provision prevents chaos. It "ensure[s] a nationally uniform regulatory system, rather than a fifty-state patchwork." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 625 (4th Cir. 2015).

Congress decided who has the power to define terms about food. It isn't the States. It isn't consumers. And it isn't federal courts, either. That power rests with the Food and Drug Administration. It is up to the FDA to define what words mean when it comes to food. And States have no power to impose new requirements, or take any requirements away.

The FDA has issued a standard of identity for "spring water." *See* 21 C.F.R § 165.110(a)(2)(vi). Spring water must "have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows naturally to the surface of the earth." *Id.*

The FDA put a lot of thought into the meaning of "spring water." The definition has a lot of requirements. But it doesn't say anything about the existence of microscopic particles:

> The name of water derived from an underground formation from which water flows naturally to the surface of the earth may be "spring water." Spring water shall be collected only at the spring or through a bore hole tapping the underground formation feeding the spring. There shall be a natural force causing the water to flow to the surface through a natural orifice. The location of the spring shall be identified. Spring water collected with the use of an external force shall be from the same underground stratum as the spring, as shown by a measurable hydraulic connection using a hydrogeologically valid method between the bore hole and the natural spring, and shall have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows naturally to the surface of the earth. If spring water is collected with the use of an external force, water must continue to flow naturally to the surface of the earth through the spring's natural orifice. Plants shall demonstrate, on request, to appropriate regulatory officials, using a hydrogeologically valid method, that an appropriate hydraulic connection exists between the natural orifice of the spring and the bore hole.

*See* 21 C.F.R § 165.110(a)(2)(vi). So, as the name suggests, spring water comes from a spring in the ground.

In BlueTriton's view, Plaintiffs' claims about the phrase "100% Natural Spring Water" are preempted because its products meet the standard of identity for "spring water" promulgated by the FDA. *See* Def.'s Mem., at 6 (Dckt. No. 15).

Plaintiffs disagree. As they see it, they "are not suing to enforce the FDCA 'spring water' standard." *See* Pls.' Resp., at 5 (Dckt. No. 16). Instead, they are only challenging the use of the words "100% Natural."

Not so. Distilled to its core, the complaint at hand seeks to impose a "no microplastics" requirement for spring water. Plaintiffs believe that the water isn't 100% natural spring water if it contains microplastics.

But the FDA defined what spring water is. And the definition of spring water makes no mention of teeny-tiny bits and pieces of itty-bitty plastic. The FDA's standard of identity

imposes no requirements at the molecular level. Plaintiffs cannot use state law to tack on additional requirements.

To be sure, the FDA does not regulate the term "natural" as a general matter. But the words "natural" and "naturally" do make several appearances in the standard of identity for spring water. *See* 21 C.F.R § 165.110(a)(2)(vi) ("There shall be a *natural* force causing the water to flow to the surface through a *natural* orifice.") (emphasis added); *id.* ("Spring water . . . shall have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows *naturally* to the surface of the earth.") (emphasis added); *id.* ("If spring water is collected with the use of an external force, water must continue to flow *naturally* to the surface of the earth through the spring's *natural* orifice.") (emphasis added).

That is, the word "natural" is part of the standard of identity for spring water. And the standard of identity for spring water does not mention microplastics. The existence of microplastics doesn't mean that the spring water isn't spring water.

The presence of microplastics also does not mean that the spring water is not "natural," or that the spring water did not come from nature. Saying that it is not "natural" spring water is the same thing as saying that it is not "spring water."

There is no daylight between challenging what "spring water" means and challenging what "natural spring water" means. The argument goes to the essence of what it means to be spring water.

Courts have widely rejected, on preemption grounds, other attempts to add to the FDA's definitions. For example, courts have concluded that the FDCA preempts claims about using the word "pure" on bottles of "purified water." *See Baker v. Nestle S.A.*, 2019 WL 960204, at *2 (C.D. Cal. 2019) ("So long as Defendant is in compliance with the FDA's requirements

regarding the term 'purified water,' any claims asserting Defendant cannot label its water 'pure' seek to impose an obligation different from the FDCA, and are preempted."); *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Pracs. Litig.*, 588 F. Supp. 2d 527, 539 (S.D.N.Y. 2008) (same).

And earlier this year, a district court dismissed on preemption grounds a claim about microplastics in spring water. A plaintiff in the Central District of California claimed that BlueTriton's use of the label "100% Mountain Spring Water" on Arrowhead water was misleading, given that the water contained microplastics. *See Bruno v. BlueTriton Brands, Inc.*, 2024 U.S. Dist. LEXIS 98451, at *2 (C.D. Cal. 2024). The court disagreed. It concluded that the FDCA preempted the claim because the FDA does not prohibit the presence of microplastics contained in "spring water." *Id.* at *7.

That's not to say that a plaintiff could never bring a state-law claim about spring water. For instance, "[a] claim based upon the misuse of the term of art 'spring water' to describe purified water is . . . consistent with the terms of the FDCA's prohibition on misbranding and might not be preempted." *Chicago Faucet Shoppe, Inc. v. Nestle Waters N. Am. Inc.*, 24 F. Supp. 3d 750, 760 (N.D. Ill. 2014). In a similar vein, plaintiffs can bring state-law claims about spring water when "state standards are substantively equivalent to the federal law standard." *Patane v. Nestle Waters N. Am., Inc.*, 369 F. Supp. 3d 382, 393 (D. Conn. 2019). But when a product complies with the FDA's standard of identity, a plaintiff can't use state law to tack on additional requirements.

Here, the complaint challenges what it means to be spring water, or natural spring water. But defining the essential characteristics of spring water is the exclusive domain of the FDA. Plaintiffs' state-law claims would impose labeling obligations for spring water beyond the

FDCA's standard of identity.  Therefore, express preemption under the FDCA bars Plaintiffs' state-law claims about Ice Mountain's "100% Natural Spring Water" label.

## IV.    Material Misrepresentations (All Claims)

Next, BlueTriton argues that Plaintiffs failed to adequately plead a material misrepresentation that would dupe a reasonable consumer.  *See* Def.'s Mem., at 9 (Dckt. No. 15). The Court agrees.

A plaintiff bringing an ICFA claim must plausibly allege that the statement was "likely to deceive a reasonable consumer."  *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020).  This showing "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  *Bell*, 982 F.3d at 474–75 (citations omitted).

In a similar vein, a common-law fraud claim "can go nowhere" without a plausible allegation of a "false or deceptive statement."  *See Matthews*, 2023 WL 4534543, at *10; *see also Cerretti v. Whole Foods Mkt. Grp., Inc.*, 2022 WL 1062793, at *2 (N.D. Ill. 2022) ("The elements of a common-law fraudulent misrepresentation claim largely overlap with a deceptive-practices claim under the ICFA, and include a false statement of material fact.") (cleaned up).

Plaintiffs claim that they interpreted the statement "100% Natural" to mean that Ice Mountain water would not contain any synthetic material.  *See* Pls.' Resp., at 8 (Dckt. No. 16). That interpretation is unreasonable.  Reasonable consumers don't buy bottled water and then look for the nearest microscope.  A reasonable consumer would take a drink, not take the water bottle to the lab for testing.

Plaintiffs' theory is that the spring water is not 100% natural because it contains microplastics.  But the microplastics are . . . well . . . microscopic.  They are tiny.  No reasonable

consumer would read the phrase "100% Natural Spring Water" and think that BlueTriton was making a guarantee at the molecular level.

It is hard to imagine what, exactly, Plaintiffs would have wanted the label to say. The amount of microplastics in a bottle of water is infinitesimally small. (And the complaint does not allege otherwise.)

What would Plaintiffs have wanted? A label that says 99.9999999999% natural spring water? No reasonable consumer thinks that way. It's a rounding error, to put it mildly. At some point, 100% is close enough for horseshoes and hand grenades.

If anything, the complaint itself reveals that no reasonable consumer would read the label that way. The complaint alleges that reasonable consumers "understand that the term '100%' refers to percentage [sic], a mathematical concept meaning part of the whole measured *in hundredths*." *See* Cplt., at ¶ 21 (Dckt. No. 1-1) (emphasis added). The complaint goes on to say that 100% does not mean 99% or 98% to a reasonable consumer. *Id.* at ¶ 22. "[R]easonable consumers understand that one-hundred parts out of one-hundred parts does not mean some other number of parts less than one-hundred parts out of one-hundred parts." *Id.*

The complaint frames the views of a reasonable consumer by referring to whole numbers – that is, 1%, 2%, and so on. But no one thinks that microplastics add up to 1% of a water bottle. The complaint certainly doesn't say so. Plaintiffs are off by who-knows-how-many decimal points.

One wonders how far this principle would go, if taken to its logical conclusion. Is there dust in water? Or a tiny amount of dirt? If so, is the presence of dust or dirt enough to render a label about "water" misleading? If so, it's katie-bar-the-door liability for hot dogs.

25

And what about microplastics in other foods? Microplastics, it seems, are everywhere. If that's true, then is it misleading to call those products what they are? Are microplastics in seafood, and meat, and other food? If so, can a grocery store sell salmon and call it "salmon," without triggering liability?

Maybe the claim depends entirely on the use of the word "natural." That is, Plaintiffs believe that the spring water isn't natural because it contains microplastics. But again, microplastics are everywhere. If the existence of microplastics means that something is not natural, then nothing is natural.

If the presence of microplastics means that a food item isn't natural, then the word "natural" can't apply to any food anywhere. Food companies couldn't use the word "natural" for anything.

No reasonable consumer would expect a disclosure about the presence of microscopic particles. The complaint fails to allege facts giving rise to a plausible inference that the label would mislead a reasonable consumer. *See, e.g.*, *Richburg v. Conagra Brands, Inc.*, 2023 WL 1818561, at *7 (N.D. Ill. 2023) (explaining that a representation on popcorn packaging about ingredients in the popcorn – which excluded a reference to migratory substances from the packaging – was "correct as a matter of law"); *Colangelo v. Champion Petfoods USA, Inc.*, 2022 WL 991518, at *21 (N.D.N.Y. 2022), *aff'd sub nom. Paradowski v. Champion Petfoods USA, Inc.*, 2023 WL 3829559 (2d Cir. 2023) (opining that no reasonable consumer could interpret the phrase "Biologically Appropriate" on a bag of dog food to mean that the dog food contains no heavy metals or BPA); *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5 (D. Minn. 2017) ("It is implausible that a reasonable consumer would believe that a product labelled as

having one ingredient – oats – that is '100% Natural' could not contain a trace amount of glyphosate that is far below the amount permitted for organic products.").

And in any event, the FDA promulgates regulations about allowable concentrations of various substances in bottled water. *See* 21 C.F.R. § 165.110. Bottled water, including spring water, can contain small amounts of unhealthy substances, such as lead, mercury, arsenic, and cyanide. *Id.*

The FDA allows bottled water to contain small quantities of chemicals. So it is hard to believe that a reasonable consumer would think that "100% Natural Spring Water" is entirely synthetic-free. Plaintiffs do not allege facts suggesting that Ice Mountain water contained a larger quantity of chemical substances than the FDA permits, either.

At the end of the day, microplastics are in just about everything. Even the most health-conscious person among us can't escape the possibility of consuming microplastics. When simply breathing air puts you at risk of inhaling microplastics, it's unreasonable to assume that your spring water won't have any microplastics.

In sum, Plaintiffs have failed to plead a material misrepresentation by BlueTriton that would deceive a reasonable consumer.

## V.     Intent (All Claims)

In BlueTriton's view, Plaintiffs failed to adequately allege that BlueTriton acted with requisite intent. *See* Def.'s Mem., at 12 (Dckt. No. 15).

Both ICFA and common-law fraud claims require a showing of intent. *See Newman*, 885 F.3d at 1003. For an ICFA claim, a plaintiff must show that the defendant intended her to rely on the deceptive act or practice. *See id.* at 1001. For a common-law fraud claim, a plaintiff must show that the defendant intended to induce the plaintiff to act. *Id.* at 1003.

27

Here, Plaintiffs allege in conclusory fashion that BlueTriton "knew or should have known" that its use of the term "100% Natural Spring Water was false, deceptive and misleading." *See* Cplt., at ¶ 39 (Dckt. No. 1-1). In a similar vein, Plaintiffs allege that "Defendant knew that the Products contained microplastics but chose to label the Products with 100% Natural Spring Water labeling anyway to induce consumers to purchase the Products." *Id.* at ¶ 40.

A conclusory assertion of intent is not enough to overcome the pleading hurdle of Rule 9(b). *See, e.g.*, *Acosta-Aguayo v. Walgreen Co.*, 2023 WL 2333300, at *7 (N.D. Ill. 2023) (concluding that "[p]laintiffs' allegations about [d]efendant's knowledge and intent [were] too conclusory to survive dismissal" where plaintiffs alleged that the defendant "knew or should have known" its statements were false or misleading); *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1165 (N.D. Ill. 2022) (holding that plaintiff's allegations about knowledge were insufficient where plaintiff alleged only that defendant's fraudulent intent was "evinced by its knowledge that the Product was not consistent with its representations"); *Daly v. FitLife Brands, Inc.*, 2023 WL 6388112, at *8 n.6 (N.D. Ill. 2023) (collecting cases).

Plaintiffs give the bottom-line conclusion, but they don't show how they got there. Their allegations about intent do not satisfy Rule 9(b)'s heightened pleading standard.

## VI. Injury & Damages (All Claims)

BlueTriton believes that Plaintiffs have failed to plausibly allege injury and damages. *See* Def.'s Mem., at 13 (Dckt. No. 15).

"The actual damage element of a private ICFA action requires that the plaintiff suffer actual pecuniary loss." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (cleaned up). A plaintiff must "provide any evidence that he paid more than the actual value of the merchandise

he received." *Camasta*, 761 F.3d at 739. In a similar vein, a plaintiff with a common-law fraud claim must "plead actual damages arising from her reliance on a fraudulent statement." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 406 (7th Cir. 2010); *see also Elias v. Stewart Title of Illinois*, 2010 WL 4482102, at *4 (N.D. Ill. 2010) (explaining that "the element of damages must be pled with specificity" under both the ICFA and the common law).

Plaintiffs allege that they "paid a premium" for Ice Mountain water because of the labeling. *See* Cplt., at ¶ 34 (Dckt. No. 1-1). They also assert that they did not receive "the benefit of the bargain they paid for" because of the misleading label. *See id.* at ¶ 33. Those allegations are insufficient.

In *Camasta*, the Seventh Circuit concluded that the plaintiff's allegations about actual damages fell short because he "failed to provide any evidence that he paid more than the actual value of the merchandise he received." *Camasta*, 761 F.3d at 739. The court found insufficient plaintiff's allegation that he "could have 'shopped around and obtained a better price in the marketplace.'" *Id.* at 740.

Likewise, in *Benson*, the Seventh Circuit held that the plaintiffs "failed to raise a plausible theory of actual damage." *Benson*, 944 F.3d at 648. The Court of Appeals explained that the plaintiffs failed to allege that the products "they received were worth less than . . . they paid for them, or that they could have obtained a better price elsewhere." *Id.* That failure was "fatal to their effort to show pecuniary loss." *Id.*

One wonders if the presence of microplastics is inherent in the product. After all, the complaint alleges that microplastics enter the water bottle by twisting the cap. *See* Cplt., at ¶ 11 (Dckt. No. 1-1). If that's true, then one wonders how Plaintiffs could have purchased water bottles without microplastics at a lower price.

29

Plaintiffs' allegations here are similarly lacking. Plaintiffs' barebones assertion that they didn't get the benefit of the bargain is not enough. They fail to show that they suffered "any observable economic consequences" from purchasing Ice Mountain water. *See Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 958 (N.D. Ill. 2008) (dismissing plaintiff's claim about lead in her lipstick because she "d[id] not allege that she would not have purchased lipstick, that she would have purchased cheaper lipstick, or that the lipstick in question had a diminished value because of the lead").

For these reasons, Plaintiffs fail to plead a plausible damages theory. That failure of pleading spells trouble for all of Plaintiffs' claims.

## VII. Unjust Enrichment (Count III)

Count III is a claim for unjust enrichment. That's a non-starter.

In Illinois, "unjust enrichment is not a separate cause of action." *Vanzant*, 934 F.3d at 739–40 (quotation marks omitted). Instead, unjust enrichment is "a condition brought about by fraud or other unlawful conduct." *Id.*

So, once the Court concludes that Plaintiffs' other claims have no juice, the unjust enrichment claim fizzles out, too. *See, e.g.*, *Castaneda*, 679 F. Supp. 3d at 756 (explaining that plaintiff's unjust enrichment claim was a "nonstarter" once the court had dismissed all other claims, including an ICFA claim); *Lederman v. Hershey Co.*, 2022 WL 3573034, at *7 (N.D. Ill. 2022) ("Because all of Plaintiff's other claims fail, so too does her unjust enrichment claim."); *Cerretti*, 2022 WL 1062793, at *7.

The Court dismisses Plaintiffs' unjust enrichment claim.

## VIII. Leave to Amend

Plaintiffs seek leave to amend their complaint. *See* Pls.' Resp., at 15 (Dckt. No. 16).

Rule 15 of the Federal Rules of Civil Procedure states that the court "should freely give leave [to amend a pleading] when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The Seventh Circuit has repeatedly emphasized that "[l]eave to amend a complaint should be granted liberally." *Glover v. Carr*, 949 F.3d 364, 370 (7th Cir. 2020); *see also Flowers v. Kia Motors Fin.*, 2024 WL 3174866, at *3 (7th Cir. 2024) ("As [Rule 15(a)(2)] states, amendment is generally favored."); *Weston v. Illinois Dep't of Hum. Servs.*, 433 F. App'x 480, 482 (7th Cir. 2011) ("Th[e] liberal policy toward amending pleadings, especially in a first effort to amend, should remain in effect even if a district court elects to enter judgment, perhaps prematurely, upon granting a motion to dismiss.").

Plaintiffs' complaint is full of holes, and the Court has significant doubts about their ability to plug them. The Court is skeptical that Plaintiffs can avoid the FDCA's preemption bar. And Plaintiffs' theory of the case – *i.e.*, that BlueTriton misled consumers about microplastics in their water – seems inconsistent with the reality that microplastics are in everything.

Still, the Court is mindful of the presumption in favor of allowing leave to amend (at least once). So, the Court will give Plaintiffs another chance. The Court grants leave to amend within two weeks of this ruling.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is hereby granted. The Court grants Plaintiffs leave to amend within two weeks.

Date: August 9, 2024

_____
Steven C. Seeger
United States District Judge